**Kenneth J. HAUGEN, Plaintiff–Appellant,**

v.

**Rochelle BROSSEAU; Puyallup Police Department; The City of Puyallup, Defendants–Appellees.**

No. 01–35954.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 4, 2003.

Filed Aug. 4, 2003.

Amended Dec. 5, 2003.

Randy W. Loun, Loun & Tyner, Bremerton, WA, for the plaintiff-appellant.

Mary Ann McConaughy, Keating Bucklin & McCormack, Seattle, WA, for the defendants-appellees.

Before REINHARDT, W. FLETCHER, and GOULD, Circuit Judges.

Opinion by Judge WILLIAM A. FLETCHER; Concurrence by Judge REINHARDT; Dissent by Judge GOULD

## ORDER AMENDING OPINION AND DENYING REHEARING AND AMENDED OPINION

### ORDER

This court's opinion, filed August 4, 2003, [339 F.3d 857] is amended as follows:

1. The fifth sentence in the full paragraph on slip op. 10604 [339 F.3d at 868] that reads:

"Brosseau had not called Subido and Pashon to assist her, and there is no indication that they were running to give her aid." is deleted.

2. The second sentence in the first full paragraph on slip op. 10608 [339 F.3d at 870] that now reads:

"But because officers can often eliminate or reduce the danger of a high-speed chase by forgoing or discontinuing a chase, we reject an approach that would allow officers to shoot a suspect simply because he is fleeing, or is about to flee, in a vehicle."

is replaced with the following two sentences:

"But the particular circumstances of each case are critical. We reject an approach that would allow officers to shoot a suspect simply because he is fleeing, or is about to flee, in a vehicle."

The dissent, filed August 4, 2003, is amended as follows:

The second and third sentences in the first full paragraph on slip op. 10619 [339 F.3d 876–77] that now read:

"Nor can I accept the majority's holding that—because police can reduce the danger of a high-speed chase by letting a felon escape—police may never use deadly force to protect the public from the danger posed by a felon's reckless flight from police in a vehicle. The majority's sweeping holding, which promises an easy escape to any felon willing to threaten innocent lives by driving recklessly, is indefensible as a matter of law and policy, and it conflicts with our sister circuits' holdings that police officers do not violate the Fourth Amendment by using deadly force to stop a fleeing felon who appears likely to drive an automobile with willful disregard for the lives of others.1"

are replaced with the following sentences:

"Nor can I accept the majority's implicit suggestion that—because police can reduce the danger of a high-speed chase by letting a felon escape—police may never use deadly force to protect the public from the danger posed by a felon's reckless flight from police in a vehicle. The majority's sweeping position, which promises an easy escape to any felon willing to threaten innocent lives by driving recklessly, is indefensible as a matter of law and policy, and it conflicts with our sister circuits' holdings that police officers do not violate the Fourth Amendment by using deadly force to stop a fleeing felon who appears likely to drive an automobile with willful disregard for the lives of others.1"

Footnote 1 remains in the edited text, as shown.

The first two sentences in the third full paragraph on slip op. 10627 [339 F.3d 881–82] that now read:

"Contrary to the holdings of every circuit to consider the issue, the majority holds that an officer violates a fleeing felon's Fourth Amendment rights by using deadly force to prevent a dangerous vehicular flight because 'officers can often eliminate or reduce the danger of a high-speed chase by forgoing or discon-

tinuing a chase.' *Supra* at 10608 [870].[10] The majority believes that police officers should permit felons to speed away unpursued rather than attempt to stop them. *See id.* at 10605 [869] ('[Officers] could either have discontinued a chase if it became too dangerous, or could have forgone a chase entirely.'); *id.* at 10607 [870] ('[A]n officer must sometimes forego or discontinue deadly force and allow a suspect to escape.')."

are replaced with the following sentences: "Contrary to the holdings of every circuit to consider analogous issues, the majority holds that an officer violates a fleeing felon's Fourth Amendment rights by using deadly force to prevent a dangerous vehicular flight; it appears that the majority believes that officers can reduce the danger of a high-speed chase by forgoing it.[10] The majority believes that police officers should permit felons to speed away unpursued rather than attempt to stop them. *Supra* at —— ('[Officers] could either have discontinued a chase if it became too dangerous, or could have forgone a chase entirely.'); *id.* at —— ('[A]n officer must sometimes forego or discontinue deadly force and allow a suspect to escape.')."

Footnote number 10 remains in the edited text, as shown.

The last sentence appearing on slip op. 10628 [339 F.3d at 881] that currently reads:

Moreover, the majority errs by putting the onus on *police* to end the pursuit by letting the felon escape, rather than on the fleeing *felon*, who at all times has the power to avoid injury to himself and others by halting as the law requires. *See id.* at 1004 (holding that a police officer's pursuit of a fleeing felon in an automobile played a "causal role" in an ensuing wreck, "but not the *kind* of cause the law recognizes as culpable. . . . [A] criminal's effort to shift the blame

[to police] . . . is not one that any legal system can accept.").

is now supplemented to read:

Moreover, the majority errs by putting the onus on *police* to end the pursuit by letting the felon escape, rather than on the fleeing *felon*, who at all times has the power to avoid injury to himself and others by halting as the law requires. *See id.* at 1004 (holding that a police officer's pursuit of a fleeing felon in an automobile played a "causal role" in an ensuing wreck, "but not the *kind* of cause the law recognizes as culpable. . . . [A] criminal's effort to shift the blame [to police] . . . is not one that any legal system can accept."). There are several problems with the majority's reasoning.

The first full paragraph on slip op. 10629 [339 F.3d at 882] currently reads:

The majority attempts to justify its departure from precedent by reasoning that Officer Brosseau's fellow police officers *might have decided* to let Haugen escape in his jeep unpursued and that, for this reason alone, Officer Brosseau did not have probable cause to believe that Haugen's vehicular flight would pose a danger to others. There are several problems with the majority's reasoning.

This paragraph should be deleted in its entirety.

With the opinion and dissent as amended, Judge Reinhardt and Judge W. Fletcher voted to deny the petition for rehearing and petition for rehearing en banc.

Judge Gould voted to grant both petition for rehearing and petition for rehearing en banc.

A judge of the court called for a vote on the petition for rehearing en banc. A vote was taken, and a majority of the active judges of the court failed to vote for en banc rehearing. Fed. R.App. P. 35(f).

The petition for rehearing and the petition for rehearing en banc, filed August 15, 2003, are DENIED.

TALLMAN, Circuit Judge, with whom Circuit Judges KOZINSKI, O'SCANNLAIN, GOULD, BYBEE, and CALLAHAN join, dissenting from our court's denial of rehearing en banc:

By declining to rehear this case en banc, the court has failed to recognize the immunity that law enforcement officers rightfully deserve to protect them when they make reasonable split-second life and death decisions in the field. In doing so, the court does a grave injustice to police officers in our circuit like Officer Rochelle Brosseau, who has been wrongfully denied qualified immunity from suit after she employed escalating force to stop a combative and determined fleeing felon. I respectfully dissent from the order denying rehearing en banc.

The panel majority fails to properly assess Officer Brosseau's actions when she sought qualified immunity from Haugen's 42 U.S.C. § 1983 action. In an excessive force case, we must examine whether an officer's actions are objectively reasonable in light of what she faces in the field. *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Our own recent case law instructs that the relevant facts and circumstances are *those known to the officer at the time she acts,* based on *her* contemporaneous knowledge of the facts. *Deorle v. Rutherford,* 272 F.3d 1272, 1281 (9th Cir.2001). By contrast, the panel majority's opinion displays no sensitivity whatsoever to the difficulties police officers face when making life and death decisions in tense situations, as the Supreme Court tells us we must. *Graham,* 490 U.S. at 396–97, 109 S.Ct. 1865.

Here, Officer Brosseau's contemporaneous knowledge of the facts would lead a reasonable officer to believe that Haugen, based on his desperate behavior, was dangerous to others. Officer Brosseau had been called to the neighborhood just the day before to take a report that Haugen had stolen tools belonging to one Tamburello, his former business associate. After taking this report, Officer Brosseau was informed by a dispatcher that Haugen had a felony no-bail warrant outstanding for drug-related offenses and other charges.

The next day, Brosseau was dispatched to Haugen's house to stop a fight in progress between Haugen and Tamburello. In the course of attempting to take Haugen into custody, Brosseau was confronted with a known felon intent on escaping capture. Haugen actively evaded arrest by hiding in the bushes in a neighbor's yard; he ran to get into his car to drive away; he defied Officer Brosseau's verbal orders to stop; he resisted her attempts to detain him when she employed lesser degrees of force by shattering the car window, attempting to grab the keys, and hitting him with the butt of her gun. Yet he continued to flee even as she pointed her gun at him. Haugen's behavior would leave no doubt in the mind of any reasonable officer that a high-speed chase was moments away.

The panel majority's opinion utterly fails to demonstrate how Officer Brosseau's perception of these several facts was *objectively* unreasonable. It holds that it was unreasonable for Officer Brosseau to think that if Haugen drove off in his Jeep Cherokee, he would endanger the occupants of other vehicles in the driveway, her fellow officers, and people in the immediate neighborhood. The majority accepts Haugen's testimony that he could easily exit the driveway with no risk of injury to Brosseau's fellow officers or the occupants of the other nearby vehicles, and asserts that "Haugen had a clear path of escape."

*Haugen v. Brosseau,* 339 F.3d 857, 874 (9th Cir.2003).

Yet Brosseau testified that the driveway was "almost completely blocked" by occupied vehicles, and that she believed her fellow officers were on foot nearby. Under *Graham v. Connor,* even an officer's *erroneous* perception or belief does not violate the Fourth Amendment if it is objectively reasonable. 490 U.S. at 396, 109 S.Ct. 1865. Was Brosseau's belief erroneous? Maybe; perhaps she misjudged distances in the excitement of quickly-unfolding events. But was it *objectively unreasonable?* No. Her perception of the distances between Haugen's Jeep and the obstacles around it was corroborated by Haugen's own deposition testimony that he was in a "small tight space," that he had to drive "across the lawn, across the curb" to get to the street, and that his girlfriend's car was "parked in front of [his] in the driveway." Even viewing the facts in the light most favorable to Haugen, his own testimony suggests that a reasonable officer making a split-second judgment to employ force had good reason to worry about the safety of people nearby or directly in the path of Haugen's impending flight. Section 1983 was never intended to be a general negligence statute, but that is exactly the effect of the majority's analysis. *See Johnson v. County of Los Angeles,* 340 F.3d 787, 791 (9th Cir.2003).

In addition, Brosseau believed that her fellow officers or others might have been standing near Haugen's vehicle because she radioed them for help when she saw Haugen and began chasing him. The majority also asserts that if the officers approached, they would have done so from a safe direction. Brosseau might have been mistaken about whether the other officers were actually in the path of Haugen's vehicle. But was her belief that they might

have been nearby *objectively unreasonable?* The two officers on foot with the K–9 unit could easily have heard her radio call or heard the struggle between Brosseau and Haugen, particularly with the noise of his window breaking, and decided to run to the front yard to offer assistance. They could have come from any direction—the majority cites no evidence to suggest that the officers necessarily must have approached from a certain angle. In addition, Haugen testified that Tamburello, with whom he had been fighting just moments before, exited his truck and was also *standing in the driveway* when Haugen drove off. Haugen's girlfriend and her small child were in a nearby Honda where Officer Brosseau had ordered them to remain while the K–9 unit searched for Haugen. Officer Brosseau's fear for the safety of her fellow officers, victim Tamburello, and other citizens was completely reasonable.

The majority emphasizes the fact that Haugen navigated out of the driveway by driving "off to the left around the Honda and pickup," and that he was "able to drive away safely even after Brosseau shot him." *Haugen,* 339 F.3d at 868, 872. But the majority's after-the-fact observation that Haugen, by sheer good luck, did not hit one of these vehicles, an officer, or a bystander as he sped over the curb and across a neighbor's lawn in a desperate and unwavering attempt to escape does not change the reasonableness of Officer Brosseau's judgment at the time. Unlike the majority, Officer Brosseau did not have the benefit of hindsight.

Because this case arose on appeal from summary judgment in favor of Officer Brosseau, we must judge any disputed facts in the light most favorable to Haugen, the non-moving party. However, the majority applies this standard of review only when it suits its purposes. As the

learned district judge noted when granting Officer Brosseau's motion, the main factual dispute in this case involves the circumstances surrounding the shooting. When initially examining the conflicting testimony about when the shot was fired, our court accepts Brosseau's version of the events:

> When parties dispute the facts, we typically accept the non-moving party's version when ruling on a summary judgment motion. In this case, however, we accept Brosseau's statement that she shot Haugen intentionally. No gun shot residue was found on Haugen's clothes, and the forensic scientist determined that the bullet hit another object before it struck Haugen. Most tellingly, photos of Haugen's Jeep show a bullet hole in the rear side window. When asked about the bullet hole in the window, Haugen responded: "That's something I can't explain." The parties do not dispute that only one shot was fired. Because the evidence unmistakably indicates that Brosseau shot Haugen through the rear side window, *we accept Brosseau's statement that she intentionally shot Haugen through that window rather than Haugen's speculation that the gun discharged accidentally inside the Jeep.*

*Haugen,* 339 F.3d at 861–62 (emphasis added).

Yet just a few pages later, the majority dismisses Brosseau's claim that the Jeep was "driving in an erratic manner" by noting that "Haugen says that Brosseau shot him before the Jeep even moved. According to Haugen, not only was he not driving 'in an erratic manner,' he was not driving at all." *Id.* at 867. The majority then states that "[a]ccepting the version of the disputed facts most favorable to Haugen, we do not credit Brosseau's assertion that 'he was driving in an erratic manner,'

for we must assume on summary judgment *that the Jeep had not even moved when Brosseau shot him." Id.* I respectfully submit that the majority is improperly switching versions of the facts to best suit its argument when it is convenient to do so. Either Brosseau or Haugen is right about when the shot was fired, but not both. Haugen thought the shot was fired accidentally *during the struggle while the Jeep was parked.* The majority determined that his speculation was not supported by evidence, so it rejected his version of events.

Given the majority's rejection of Haugen's statement, we are left with Brosseau's testimony and that of the other eyewitnesses. Brosseau testified that she shot intentionally at the back of Haugen's Jeep *as he started* to drive away. Her statement was corroborated by the physical evidence. In addition, all the eyewitnesses agreed that Haugen was just starting to pull out of the driveway when Brosseau shot. Even taken in the light most favorable to Haugen, it is clear that the Jeep may not have moved very far, but by all accounts it was moving. Given this evidence and the majority's earlier rejection of Haugen's testimony, it is plainly contradictory for the majority to later assert that the shot was fired during Haugen's struggle with Officer Brosseau *before* he began to drive off.

It was wrong to deny qualified immunity to Officer Brosseau. Rather than looking at the facts and circumstances as Brosseau reasonably perceived them at the time of the shooting, the majority goes to great lengths to explain—with the benefit of hindsight—the small ways in which Officer Brosseau's perceptions were inaccurate. That may be the case. But the Supreme Court tells us that even an officer's *erroneous* perception or belief does not amount to a constitutional violation if it is objec-

tively reasonable. *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. Because the majority fails to demonstrate how Officer Brosseau's actions were objectively unreasonable, she should receive immunity from Haugen's suit.

Gilbert and Sullivan were right: "A policeman's lot is not a happy one."[1] The court's erroneous opinion will make them no happier, as it demonstrates the unfairness of judicial second-guessing of split-second decision-making in tense circumstances. I respectfully dissent from the decision not to rehear this case en banc.

## OPINION

W. FLETCHER, Circuit Judge:

On February 21, 1999, Officer Rochelle Brosseau of the Puyallup, Washington, Police Department shot Kenneth Haugen in the back as he tried to flee from police in his vehicle. Haugen filed a § 1983 suit in district court alleging a violation of his constitutional rights, and the court granted summary judgment to Brosseau. Construing the evidence in the light most favorable to Haugen, we inquire whether Brosseau's use of deadly force violated the Fourth Amendment and, if it did, whether she is entitled to qualified immunity. We conclude that the evidence, so construed, shows that Brosseau's conduct violated the Fourth Amendment, and, further, that her conduct violated clearly established law governing the use of deadly force as set forth in *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). We therefore reverse the district court's grant of summary judgment.

## I. Background

Kenneth Haugen and Glen Tamburello were in business together selling drugs and occasionally fixing cars. At some point, their relationship soured, and Haugen decided to dissolve the partnership. On February 20, 1999, he took some of his tools from Tamburello's shop. Tamburello wanted the tools back and wanted retribution. He went to the police station, and, in an interview with Officer Rochelle Brosseau, reported that Haugen had burglarized his shop. Tamburello also contacted the Riddles, neighbors of Haugen's mother, and requested that they call him should they see Haugen at his mother's house.

Haugen, his girlfriend Deanna Nocera, and Nocera's daughter went to Haugen's mother's residence the night of February 20, where they did some laundry and spent the night. The next morning, Haugen began to spray-paint his 1984 Jeep Cherokee in his mother's driveway. He had a warrant out for his arrest and apparently thought he might evade detection driving a yellow rather than a white Jeep. It was a windy morning, and the Riddles complained to Haugen that the spray paint was blowing into their yard. When Haugen refused to stop, the Riddles called Tamburello. Tamburello drove with Matt Atwood to Haugen's mother's house where they accosted Haugen. Haugen began to run away, but Tamburello caught him, threw him to the ground, and began to beat him up. Haugen and Nocera begged Tamburello to stop, and, after being persuaded by several punches, Haugen agreed to give the tools back. Tamburello and Atwood then forcibly led Haugen into the pickup and planned to drive to a storage facility where Haugen had stashed the tools, but Irene Riddle, having seen the brouhaha outside, had already dialed 911.

After her interview with Tamburello on February 20th, Officer Brosseau had

---

**1.** William S. Gilbert & Arthur S. Sullivan, *When a Felon's Not Engaged in His Employ-* *ment (The Policeman's Song) in The Pirates of Penzance* (1879).

learned that there was a felony no-bail warrant out for Haugen's arrest based on drug and other offenses. The next morning, while in the midst of a traffic stop nearby, Brosseau heard the report of the ruckus at Haugen's mother's house. She responded quickly, and when she arrived Tamburello and Atwood were in the process of getting Haugen into the pickup. Haugen took advantage of the distraction caused by Brosseau's arrival and broke away from his would-be captors. He ran up the driveway, past his mother's house, and into the backyard. Brosseau gave chase for only a few steps and then called for back-up, including a K–9 unit to help locate Haugen. Over the next half hour or so, Brosseau and other officers interviewed the witnesses still at the scene and set up a containment perimeter for the search. To avoid interfering with the K–9's efforts to locate Haugen by scent, the officers instructed Tamburello and Atwood to remain in Tamburello's pickup and instructed Nocera and her daughter to remain in her Honda. The pickup was parked in the street in front of the driveway. The Honda was parked in the driveway in front of the Jeep. The Jeep was in the driveway facing the Honda and the street and was angled somewhat to the left.

Haugen, meanwhile, hid in various bushes and other locations around the neighborhood as he tried to watch what was happening at his mother's house. Apparently seeking help, Haugen knocked on the back door of Margaret Rounds, a neighbor who lived down the street. No one answered, so Haugen left. Rounds was at home and was aware of the situation outside because she had been listening to a police scanner, but she had no inclination to help Haugen. Instead, she called police and said that there was a man in her backyard. Brosseau and the two other officers on foot, Officers Subido and Pashon (with the K–9), ran to Rounds's back-

yard. Subido told Brosseau to circle around the front, and as Brosseau rounded the house, she saw Haugen about fifty feet ahead of her running toward his Jeep.

Haugen got into the Jeep and tried to start it. Brosseau ran to the Jeep with her handgun drawn and ordered him to stop. As Haugen fumbled with his keys, Brosseau hit the driver's side window several times with her handgun, and, on the third or fourth try, she broke the window. Brosseau had mace and a baton but did not use them. Instead, she tried to reach in the car to grab the keys, but just after she broke through the window, Haugen succeeded in starting the Jeep. Either before Haugen pulled away, or just after he started to do so (the evidence is conflicting on this point), Brosseau shot him in the back. From Brosseau's position when she shot, Haugen was in front of her, and beyond Haugen were Nocera, Nocera's daughter, Tamburello, and Atwood. Brosseau said that she was "aware of the background exposure," but she nonetheless believed she had a safe shot because she thought the bullet would be stopped by the Jeep's engine block before reaching the bystanders. Because Haugen did not stop, Brosseau believed she had missed him, but Brosseau did not take a second shot because she thought the risk became too great as he began to drive away.

The bullet entered Haugen's back near the left shoulder blade and lodged in his chest. Despite the wound, Haugen managed, in his words, to "stand on the gas" and to drive out of the driveway, across the neighbor's yard, and onto the street. Photographs in the record show tire tracks on the driveway due to displacement of gravel. After Haugen escaped, some of the officers gave chase. Haugen's injury made it difficult for him to drive. Once he realized he had been shot, he used one hand to hold the wound and the other to

drive. According to Haugen, he never got the Jeep past third gear and never drove faster than forty-five miles per hour. Before long, Haugen had difficulty breathing and pulled over to the side of the road, where he passed out. He was apprehended and taken to the hospital.

The precise circumstances of the shooting are disputed. In his deposition, Haugen testified that he believed the gun may have discharged accidentally while Brosseau was reaching through the driver's window grappling with him. Brosseau, on the other hand, says she shot Haugen intentionally. According to Brosseau, she stepped back and away from the driver's window once the Jeep started moving and fired one shot through the rear side window on the driver's side.

When parties dispute the facts, we typically accept the nonmoving party's version when ruling on a summary judgment motion. In this case, however, we accept Brosseau's statement that she shot Haugen intentionally. No gun shot residue was found on Haugen's clothes, and the forensic scientist determined that the bullet hit another object before it struck Haugen. Most tellingly, photos of Haugen's Jeep show a bullet hole in the rear side window. When asked about the bullet hole in the window, Haugen responded: "That's something I can't explain." The parties do not dispute that only one shot was fired. Because the evidence unmistakably indicates that Brosseau shot Haugen through the rear side window, we accept Brosseau's statement that she intentionally shot Haugen through that window rather than Haugen's speculation that the gun discharged accidentally inside the Jeep.

Haugen recovered from the gunshot and filed suit in district court under 42 U.S.C. § 1983 claiming that Brosseau, the Puyallup Police Department, and the City of Puyallup deprived him of his Fourth Amendment rights. He also alleged causes of action based on Washington tort law. The defendants moved for summary judgment, and the district court granted their motion. It held that, even if the shooting constituted excessive force under the Fourth Amendment, Brosseau had not violated a clearly established right and was therefore protected by qualified immunity. The district court also held that Haugen had not pointed to any official practice that led to a constitutional violation, and so he could not pursue a suit against the police department or the City of Puyallup. Finally, the court held that Haugen could not pursue state tort claims because his injury occurred during the commission of a felony.

Haugen appealed. We review a grant of summary judgment de novo. *See Oliver v. Keller*, 289 F.3d 623, 626 (9th Cir.2002).

## II. Discussion

### A. Fourth Amendment Claim Against Brosseau

Officer Brosseau argues that she is entitled to qualified immunity from Haugen's Fourth Amendment claim. Following the Supreme Court's ruling in *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), we undertake a two-step analysis when a defendant asserts qualified immunity in a motion for summary judgment. We first face "this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201, 121 S.Ct. 2151. If we determine that a constitutional right has been violated, we then move to the second step and "ask whether the right was clearly established" such that "it would be clear to a reasonable officer that [her] conduct was unlawful in

the situation [she] confronted." *Id.* at 201–02, 121 S.Ct. 2151.

### 1. Fourth Amendment Right

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Supreme Court has held that the Fourth Amendment prohibits the use of excessive force by police in the course of apprehending suspected criminals. *See Graham v. Connor,* 490 U.S. 386, 394–95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the Supreme Court set forth the specific constitutional rule governing when police officers may use deadly force:

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead. . . .
>
> . . . Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id.* at 11–12, 105 S.Ct. 1694. Under *Garner,* deadly force cannot be justified based merely on a slight threat. An officer may not use deadly force "unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Id.* at 3, 105 S.Ct. 1694.

The application of *Garner* is clear in many cases. Where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force. *See, e.g., Billington v. Smith,* 292 F.3d 1177, 1185 (9th Cir.2002) (holding that deadly force was justified where a suspect violently resisted arrest, physically attacked the officer, and grabbed the officer's gun); *Reynolds v. County of San Diego,* 84 F.3d 1162, 1168 (9th Cir.1996) (holding that deadly force was reasonable where a suspect, who had been behaving erratically, swung a knife at an officer); *Scott v. Henrich,* 39 F.3d 912, 914 (9th Cir.1994) (suggesting that the use of deadly force is reasonable where a suspect points a gun at officers); *Garcia v. United States,* 826 F.2d 806, 812 (9th Cir.1987) (holding that deadly force was reasonable where the decedent attacked an officer with a rock and stick).

On the other hand, the mere fact that a suspect possesses a weapon does not justify deadly force. *See, e.g., Harris v. Roderick,* 126 F.3d 1189, 1202 (9th Cir.1997) (holding, in the Ruby Ridge civil case, that the FBI's directive to kill any armed adult male was constitutionally unreasonable even though a United States Marshal had already been shot and killed by one of the males); *Curnow v. Ridgecrest Police,* 952 F.2d 321, 324–25 (9th Cir.1991) (holding

that deadly force was unreasonable where the suspect possessed a gun but was not pointing it at the officers and was not facing the officers when they shot); *Ting v. United States*, 927 F.2d 1504, 1508–11 (9th Cir.1991) (holding that deadly force was unreasonable where a suspect had dropped his gun).

In some circumstances, deadly force may be justified based on the nature of the crime committed by the fleeing suspect. *See, e.g., Forrett v. Richardson*, 112 F.3d 416, 420 (9th Cir.1997) (holding that deadly force was reasonable where a fleeing suspect had shot a victim in the course of a burglary). But the prior commission of even a violent crime does not always justify deadly force. *See Harris*, 126 F.3d at 1203 ("The fact that [the suspect] had committed a violent crime in the immediate past is an important factor but it is not, without more, a justification for killing him on sight."); *Hopkins v. Andaya*, 958 F.2d 881, 887 (9th Cir.1992) (holding that an officer's second use of deadly force was unreasonable even though the suspect had violently assaulted the officer a few minutes before; by the time of the second use of deadly force, the suspect was advancing toward the officer but was wounded and unarmed).

The parties dispute whether, under *Garner*, Officer Brosseau's use of deadly force was reasonable in the circumstances of this case. In a five-page type-written statement and in a lengthy tape-recorded police department interview, Brosseau described the episode and gave her reasons for using deadly force. First, Brosseau stated that, at the time she shot Haugen, she knew that he had a felony no-bail warrant outstanding for drug-related charges, and she had probable cause to believe that he had committed a burglary. Second, Brosseau stated that she saw Haugen reach below the seat of the Jeep, and that she thought

he might be reaching for a weapon. Third, Brosseau stated that she believed Haugen would injure officers or other people in the area by fleeing in the Jeep. She said that he "was driving in an erratic manner," and that she shot him to prevent possible injury to others. We analyze Brosseau's stated reasons in turn.

### a. Haugen's Prior Crimes

Brosseau stated that she knew of the warrant for Haugen's arrest and that she believed he had committed a burglary. Under *Garner*, the fact that Brosseau believed Haugen had committed drug crimes and a burglary is not sufficient to justify deadly force. In many deadly force cases, the plaintiff will have committed one or more crimes, but *Garner* and our circuit cases make clear that the mere commission of prior crimes does not justify the use of deadly force. In *Garner* itself, the fleeing suspect was a burglar. *See* 471 U.S. at 3–4, 105 S.Ct. 1694. In *Ting*, the suspect was part of a major narcotics organization. *See* 927 F.2d at 1507–08. In *Curnow*, officers believed that the suspect had assaulted a woman. *See* 952 F.2d at 323. In *Andaya*, the suspect had just violently assaulted the officer. *See* 958 F.2d at 883–84. In *Harris*, the suspect had fired shots into the woods and may even have been the man who killed a United States Marshal. *See* 126 F.3d at 1193. In none of these cases, including *Garner*, did the suspect's crime justify the use of deadly force.

Here, Brosseau had reason to believe that Haugen had committed drug crimes and burglary. Drug crimes and burglary are serious offenses, but under *Garner* the critical question is whether the officer has "probable cause to believe that [the suspect] has committed a crime involving the infliction or threatened infliction of serious physical harm." 471 U.S. at 11, 105 S.Ct.

1694. Brosseau had no such probable cause.

### b. Haugen's Potential Weapon

Officer Brosseau said she believed that Haugen might have a weapon in the car. When Haugen was running toward the Jeep, Brosseau said that she thought he might be running for a weapon since he would not be running simply to hide there. When she first approached the Jeep, she said that he "reached down to an area on the floorboard in the middle of the front seat" and that she "thought he was reaching for a weapon." Once she broke the window, however, Brosseau saw that he had only keys in his hands. But moments later, just as he started the car, Brosseau said Haugen "dived forward as if to grab something on the floorboard again." Brosseau stated that she feared again that he might have a weapon, and that she therefore stepped back and away from the driver's window.

Brosseau admitted that at the time she shot Haugen, she was not worried that he would use any weapon against her. She had stepped back and away from him, and had positioned herself behind him, so that even if Haugen had had a gun he would not have had a clear shot. She said, however, that she feared if Haugen had a gun he might use it on some officers who might have approached the front of his car, or that he might use it against Tamburello or Atwood, "who he had cause to be unhappy with."

The factual predicate of Brosseau's stated reason is that Haugen dove forward as he started the car. But several other witnesses gave statements about what Haugen was doing in the car. None of these witnesses mentioned that Haugen dove forward, and none has offered any support for Brosseau's assertion that Haugen looked as if he might have been reaching for a weapon. Nor has Brosseau offered any other evidence to support her belief that Haugen might have had a gun. She did not see a gun in the car, and she had not received any reports that he might have one, or indeed that he had ever had one. Under Ninth Circuit precedent, the mere presence of a weapon does not justify the use of deadly force, *see Harris*, 126 F.3d at 1202; *Curnow*, 952 F.2d at 324–25; *Ting*, 927 F.2d at 1508–11, let alone the *potential* presence of a weapon.

"[A] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir.2001). Movements by a suspect are not enough to justify deadly force if, in light of the relevant circumstances, those movements would not cause a reasonable officer to believe that the suspect was reaching for a weapon. In support of her stated fear that Haugen was reaching for a weapon, Brosseau has cited no objective factors other than her stated observation that he dove forward and appeared to be reaching for something. Construing all of the relevant facts and circumstances and drawing all reasonable inferences in Haugen's favor, as we must on a motion for summary judgment, we conclude that Brosseau has not demonstrated an objectively reasonable fear about a potential weapon that would justify her use of deadly force.

### c. Impending Escape in a Vehicle

Finally, Brosseau asserted that she feared Haugen would injure officers or others when he tried to get away in his Jeep. In her type-written report, Brosseau described her perception of the threat presented by Haugen's escape. In relevant part, her report states:

I was fearful for the other officers on foot who I believed were in the immediate area, for the occupied vehicles in his path and for any other citizens who might be in the area. It should be noted that the small red car [*i.e.*, Nocera's Honda] was parked directly in front of the Jeep and that I had last seen Nocera and her daughter sitting inside of it. I saw no one between the Jeep and me. I fired one round through the rear driver's side window. I had aimed at a position I perceived would be the driver's location in an attempt to stop him before he could hurt anyone.

. . .

During my encounter with Haugen it was obvious that he was in a wholly unstable frame of mind. He did not exhibit any regard for his own life. I considered Haugen an immediate danger to all around him and made every attempt to stop him including attempting to stun him by striking his head. At this time I am unable to make an accurate estimation of the distance the Jeep was from me when I fired.

In her tape-recorded police department interview, Brosseau further described her decision to use deadly force based on what she perceived as the threat posed by Haugen's imminent escape. The relevant portions of her interview are as follows:

Q. At that point, who then did you become concerned about?

A ... [M]y concern at that point and time were for the vehicles directly in front of him. One, which was um, directly in front of him, which is occupied by a woman and her child. And the other officers that I felt were in the immediate area, that were coming on foot to back me up. I was quite sure that some of them were right close to where he was driving.

. . .

Q. How close do you think his uh, speeding car came from striking [Nocera's red Honda]?

A. I don't know.

Q. Okay. Was It Within Ten Feet?

A. I don't know.... I'm having some trouble with perceptions of distances.

Q. Okay. Can you estimate how close you were to his car um, when you fired the shot?

A. No. Not at this time.

. . .

Q. Okay. Did, was there a way for him, the Cherokee to get out onto the street by using the driveway?

A. No.

Q. So what did you think he was going to do?

A. Well, the driveway was completely blocked by the uh, the pick up truck. And the little red car was almost completely blocking it as well. So, I thought that his only way out of there was going to be to, to strike the truck or the little red car, or both.

Q. So the two people in the truck were, were in danger of being struck by a recklessly driven vehicle?

A. Yes.

Q. As well as the little girl and the mother?

A. Yes.

Q. Haugen's girlfriend in the red car? Where, were did you believe the other officers at the scene were, um, during the incident where you, were you, when you fired the shot? At that moment.

A. At that moment uh, can we stop the tape again for a second?

. . .

Q. When you were at the driver's door confronting Haugen, um, where were the other officers at the scene?

A. I, I did not see where they were at.

Q. Where did you think they were at?

A. I presume that they were in the immediate area, approaching to assist me.

. . .

Q. Um, what was your objective when you fired your weapon at the moment you fired the weapon?

A. To protect my fellow officers and the community from an eminent [sic] danger.

Q. You reasonably believed that there was an immediate threat to their life?

A. Yes, I Do.

. . .

Q. Okay. And once again, just so that I know for sure, can you give me an, your basis for the reasonable belief that the other people's lives were threatened?

A. First of all, I still had in mind that he had a weapon. Um, I thought that it would be very difficult for him to try and shoot at me from the position we were at when I fired. Uh, however, I felt that he could've fired on any officers in front of him, or the people in the pick-up truck, uh, who he had cause to be unhappy with. And his driving, more than anything else. His vehicle. I did not believe he could see where he was going. He was driving in an erratic manner. Now had pedestrians and officers and residents in the area.

Brosseau thus indicated in her written statement and interview that she was concerned that Haugen's driving would endanger her "fellow officers," the four people in the Honda and the pickup, and others. She variously characterized these people as "any other citizens who might be in the area," those who were "all around him," "the community," and "residents in the area."

To the extent that Brosseau said she shot Haugen because he "was driving in an erratic manner," her statement is not supported by the evidence regarding the timing of the shooting. Haugen says that Brosseau shot him before the Jeep even moved. According to Haugen, not only was he not driving "in an erratic manner," he was not driving at all. Others stated that, at most, Haugen's Jeep had just begun to move. Nocera said that Brosseau shot Haugen after he started the Jeep, just as he was "getting ready to pull out," and that it "was barely starting to roll." Aaron Riddle said he heard the shot "pretty much at the same time" that the Jeep started moving. Irene Riddle said she heard the shot just as Haugen first revved up the Jeep. Neighbor Florence Ledbetter across the street said she saw and heard the shot just when the Jeep "started to move." Tamburello stated that the Jeep was already moving, but had gone perhaps six feet. Atwood said that Brosseau shot when the Jeep "just started pulling away," that it "[h]adn't moved very far," and that it had gone "maybe" five or ten feet. Accepting the version of the disputed facts most favorable to Haugen, we do not credit Brosseau's assertion that "he was driving in an erratic manner," for we must assume on summary judgment that the Jeep had not even moved when Brosseau shot him.

Brosseau also stated that she thought Haugen's driving was particularly dangerous because he could not see where he was going. Brosseau said that "the front windshield and at least part of the passenger side windows [of the Jeep] were covered

with" the newspaper Haugen had used to protect the glass from the spray paint. Haugen, however, testified that there was no paper on the windshield. Atwood also stated that there was no newspaper on the windshield. Tamburello stated that he saw some paper on one side of the windshield, but that Haugen pulled it off before he got in the Jeep. Because at this stage in the proceedings we must construe the factual evidence in Haugen's favor, we cannot say that there was objective evidence supporting Brosseau's claim that Haugen could not see where he was going as a result of the newspaper covering the windshield.

Brosseau further explained that, at the moment she fired, she did not believe that Haugen's impending escape in the Jeep posed a danger to her, but that it did pose a danger to others in the area. She stated that she was worried, specifically, about Nocera, Nocera's daughter, Tamburello, and Atwood. Nocera and her daughter were inside the red Honda that was parked in the driveway between the Jeep and the street. Tamburello and Atwood were seated in the pickup that was parked in the street at the end of the driveway.

Brosseau indicated that she was worried that Haugen could not escape without hitting the Honda or the pickup. According to Brosseau, the driveway was "completely blocked" by the pickup and "almost completely block[ed]" by the Honda. But Brosseau could not say how close Haugen actually came to hitting the Honda: "I'm having some difficulty with perceptions of distances." Brosseau nonetheless argues that she reasonably believed that Haugen's escape was dangerous because he was likely to hit the Honda or the pickup.

Contrary to Brosseau's statements, Haugen stated that he had an easy escape by driving off to the left around the Honda and pickup. Haugen admitted that he was

in a fairly "small, tight space" which was "not like a parking lot," but he said that the driveway was about twenty feet wide and that he had "plenty of room" to drive between the Honda and the neighbor's house without hitting anything. The Jeep was already angled to the left, and Atwood stated that he saw Haugen turn the wheels to the left before putting the Jeep in gear. Haugen said that he had a "clear, straight shot" out of the driveway. The photographs of the scene also show that Haugen had more than enough room to drive away without striking Nocera's Honda or Tamburello's pickup. Viewing the evidence in Haugen's favor, we conclude that Brosseau has not pointed to objectively reasonable factors to support her belief that Haugen's escape from the driveway posed a significant risk of death or serious injury to the people in the Honda and the pickup.

Brosseau also asserted that she feared for the safety of her fellow officers. She has offered no specific evidence to support this fear. She claims that she "presume[d] that they were in the immediate area, approaching to assist," but she does not claim that she saw them or knew that they were in a dangerous place. She had left officers Subido and Pashon, the only other officers on foot, in Rounds's backyard. Two other officers were in their patrol cars in containment positions on the street several hundred feet to the south of Haugen's mother's house. Atwood, who witnessed the events while seated in Tamburello's pickup, stated that the other two officers were still in the backyard at the time Brosseau fired. Even if they had been running to assist, Subido and Pashon would have been running from the southeast, while Haugen was escaping to the north-west. Thus, while Brosseau stated that she feared that officers on foot might be struck by Haugen's Jeep as he drove away, her statement is no more than a "a

simple statement" of fear unsupported by "objective factors." *Deorle,* 272 F.3d at 1281. She has not offered any evidence to support the claim that Haugen posed a significant risk of death or serious bodily injury to fellow officers.

### d. High Speed Police Chase

The dissent contends that a need to prevent a dangerous high-speed police chase justified Brosseau's decision to use deadly force. Brosseau stated that she was concerned about Haugen's erratic driving, but she never stated that she shot to prevent a dangerous high-speed chase, and has not argued to us that a potential chase justified her use of deadly force. In this respect, this case to some extent resembles *Garner,* where the police officer had initially justified his use of deadly force based only on the need to prevent Garner's escape but asserted later—apparently through counsel—that deadly force was justified by Garner's dangerousness. *See Garner,* 471 U.S. at 21, 105 S.Ct. 1694. We know from *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), that "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." The relevant facts and circumstances are those known to the officer at the time she acts. "[A]n officer's use of force must be objectively reasonable based on [her] contemporaneous knowledge of the facts." *Deorle,* 272 F.3d at 1281. We examine the objective facts and circumstances known to Brosseau at the time she acted to determine whether she had probable cause to believe that a potential high-speed chase "pose[d] a significant threat of death or serious physical injury to the officer or others." *Garner,* 471 U.S. at 3, 105 S.Ct. 1694.

At the time Brosseau shot Haugen, it was clear that he intended to flee in his Jeep and that a number of non-lethal measures had failed to prevent him from doing so. But it is equally clear that Brosseau and her fellow officers did not need to kill Haugen in order to avoid a dangerous high-speed chase. They could either have discontinued a chase if it became too dangerous, or could have forgone a chase entirely. Haugen had already remained at large for several months while his no-bail warrant was outstanding, and there is no reason that the events of February 20 and 21 suddenly made his freedom an immediate threat to public safety. The cost to society of allowing criminals to flee is great, but the Supreme Court has held that this cost does not always justify deadly force. "It is not better that all felony suspects die than that they escape." *Id.* at 11, 105 S.Ct. 1694.

Because Brosseau has made no argument based on the danger of a potential high-speed chase, there is nothing in the record to tell us whether, under the Puyallup Police Department policies or other applicable rules, it would have been appropriate for the officers to initiate or continue a high-speed chase that posed a significant danger to others. We note, however, that under Washington law, police officers in pursuit must drive with due regard for the safety of others. *See* Wash. Rev. Code § 46.61.035. Officers in Washington may be held liable for injuries caused during high-speed chases, and, to comport with their state law duty of care, they must recognize "that at times it would be more prudent to cease a pursuit in order to protect the public." *Mason v. Bitton,* 85 Wash.2d 321, 534 P.2d 1360, 1363 (1975).

Different states and localities have different laws and policies regarding police pursuit. Many have recognized that officers have duties of care in relation to

vehicular pursuits, and that officers may be unreasonable in initiating or continuing high-speed chases depending, among other things, on the nature of the suspect's crimes.[1] "Unusual circumstances may make it reasonable" for police to initiate or continue high-speed chases, but "such conduct is not justified unless the end itself is of sufficient social value." *Haynes v. Hamilton County*, 883 S.W.2d 606, 611 (Tenn.1994). "The decision to initiate or continue pursuit may be negligent when the heightened risk of injury to third parties is unreasonable in relation to the interest in apprehending suspects." *Travis v. City of Mesquite*, 830 S.W.2d 94, 99 (Tex.1992). A ruling that allowed officers to use deadly force to prevent all vehicular escapes would have the paradoxical result that officers could reasonably shoot to kill even when, under state law, they could not reasonably initiate or continue a chase.

The dissent concludes that a justifiable means of eliminating the danger of a possible high-speed chase in this case is to shoot the suspect before he begins to drive away. The dissent relies on an article, not cited by the parties, attesting to the danger of police chases. *See* dissent at 10622, n. 5 (citing John Hill, *High Speed Police Pursuits: Dangers, Dynamics, and Risk*

*Reduction,* FBI Law Enforcement Bulletin 14 (July 2002)). But the article reaches quite a different conclusion from the dissent. Even after a suspect has fled and a pursuit has been initiated,

> [t]he most effective way to reduce risks is to terminate a pursuit. Clearly, too many pursuits continue that officers obviously should have terminated.
>
> Research on pursuit data and statistics show that termination dramatically could reduce traffic accidents, fatalities, and injuries. Police must reevaluate their thinking and mission. Agencies rarely can justify endangering the public to pursue a violator.

*Hill, supra,* at 16 (endnote omitted). Thus, just as *Garner* instructs that, to comply with the Fourth Amendment, an officer must sometimes forgo or discontinue deadly force and allow a suspect to escape, *see* 471 U.S. at 11–12, 105 S.Ct. 1694, state tort laws and police practice experts instruct that an officer must sometimes forgo a chase and allow a suspect to escape.

It is no less true in potential high-speed chases than in other circumstances that an officer may appropriately use deadly force

---

1.  *See, e.g., Biscoe v. Arlington County*, 738 F.2d 1352, 1363 (D.C.Cir.1984) (applying D.C. law); *Seals v. City of Columbia*, 641 So.2d 1247, 1248 (Ala.1994); *Estate of Aten v. City of Tucson*, 169 Ariz. 147, 817 P.2d 951, 955 (1991); *City of Caddo Valley v. George*, 340 Ark. 203, 9 S.W.3d 481, 487 (2000); *Brummett v. County of Sacramento*, 21 Cal.3d 880, 148 Cal.Rptr. 361, 582 P.2d 952, 956 (1978); *Tetro v. Town of Stratford*, 189 Conn. 601, 458 A.2d 5, 8–10 (1983); *City of Pinellas Park v. Brown*, 604 So.2d 1222, 1225 (Fla. 1992); *Cameron v. Lang*, 274 Ga. 122, 549 S.E.2d 341, 347–48 (2001); *Boyer v. State*, 323 Md. 558, 594 A.2d 121, 132 (1991); *Fiser v. City of Ann Arbor*, 417 Mich. 461, 339 N.W.2d 413, 417 (1983) (overruled in part, *Robinson v. City of Detroit*, 462 Mich. 439, 613 N.W.2d 307 (2000)); *Smith v. City of*

*West Point*, 475 So.2d 816, 818 (Miss.1985); *Oberkramer v. City of Ellisville*, 650 S.W.2d 286, 292 (Mo.Ct.App.1983); *Lee v. City of Omaha*, 209 Neb. 345, 307 N.W.2d 800, 803 (1981); *Selkowitz v. County of Nassau*, 45 N.Y.2d 97, 408 N.Y.S.2d 10, 379 N.E.2d 1140, 1143 (1978); *Parish v. Hill*, 350 N.C. 231, 513 S.E.2d 547, 550 (1999); *Jones v. Ahlberg*, 489 N.W.2d 576, 580 (N.D.1992); *Lowrimore v. Dimmitt*, 310 Or. 291, 797 P.2d 1027, 1030–31 (1990); *Kuzmics v. Santiago*, 256 Pa.Super. 35, 389 A.2d 587, 590 (1978); *Haynes v. Hamilton County*, 883 S.W.2d 606, 610–11 (Tenn.1994); *Travis v. City of Mesquite*, 830 S.W.2d 94, 99 (Tex.1992); New Jersey Police Vehicular Pursuit Policy, Att'y Gen. Guidelines (Dec.2001); Los Angeles Police Dep't Manual, ch. 555 (2003); Seattle Police Dep't Policies & Procedures § 1.141 (2003).

if "necessary to prevent an escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Id.* at 3, 105 S.Ct. 1694. But the particular circumstances of each case are critical. We reject an approach that would allow officers to shoot a suspect simply because he is fleeing, or is about to flee, in a vehicle. Such an approach would essentially limit the Supreme Court's holding in *Garner* to cases where a suspect flees on foot. The Court's opinion contains no such limitation, and we decline to read such a limitation into it.

To support its contention that the possibility of a dangerous high-speed chase justified Brosseau's use of deadly force in this case, the dissent cites general statistics of the dangers of car chases. These statistics have not been supplied by the parties, and perforce have not been relied on by Brosseau or responded to by Haugen. Moreover, even if we could properly take judicial notice of statistics of car chases, the Supreme Court already has rejected this kind of general statistical approach to prove dangerousness in an individual case. In *Garner*, Tennessee attempted to justify its use of deadly force on a fleeing burglar by noting that 3.8% of burglaries involved violent crime, accounting for literally millions of incidents of violence. *See id.* at 21–22 & n. 23, 105 S.Ct. 1694. But the Supreme Court held that the general statistical probability alone cannot justify deadly force. A generalized assessment of dangerousness of burglars "could not, without regard to the other circumstances, automatically justify the use of deadly force." *Id.* at 21, 105 S.Ct. 1694.

In some fairly extreme circumstances, our sister circuits have held that the danger presented by suspects who flee in vehicles can justify deadly force. In *Smith v. Freland,* 954 F.2d 343, 347–48 (6th Cir. 1992), the Sixth Circuit held that an officer was justified in using deadly force after a suspect had led police on a high-speed chase at speeds over ninety miles per hour, swerved toward police cars several times, and smashed into an officer's car while the officer stood next to it. In *Cole v. Bone,* 993 F.2d 1328, 1330–33 (8th Cir. 1993), the Eighth Circuit held that deadly force was justified where the suspects, driving an eighteen-wheel tractor-trailer, had led police on an extended chase at speeds over ninety miles per hour through heavy traffic, forcing over 100 cars off the road, and had swerved at pursuing police several times. In that case, before using deadly force, the police had attempted roadblocks and had tried to disable the truck by shooting the tires and radiator. In *Scott v. Clay County,* 205 F.3d 867, 877–78 (6th Cir.2000), the Sixth Circuit held that deadly force was justified where the suspect had swerved off the road, narrowly missed an unmarked cruiser and a sheriff on foot, led police on a twenty-minute chase at speeds up to 100 miles per hour, and after losing control, attempted to run down an officer. In *Pace v. Capobianco,* 283 F.3d 1275, 1281–82 (11th Cir.2002), the Eleventh Circuit held that deadly force was justified where a suspect, already pepper-sprayed after struggling with an officer, led police on an extended high-speed chase, during which he made erratic turns, drove on the wrong side of the road with his headlights off, swerved at oncoming cars, drove through a yard, nearly hit a motorist, and then accelerated toward a patrol car.

But our sister circuits have also held that police chases—even high-speed chases—do not always justify deadly force. *See Vaughan v. Cox,* 264 F.3d 1027, 1031–34 (11th Cir.2001), *vacated by* 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002), *reinstated and supplemented on remand at* 316 F.3d 1210 (11th Cir.2003);

**390**

Donovan v. City of Milwaukee, *17 F.3d 944, 946–51 (7th Cir.1994). In* Vaughan, *officers pursued a vehicle that had rammed a patrol car and then accelerated to eighty or eighty–five miles per hour in an attempt to avoid capture. In an attempt "to disable either the truck or [the driver]" one of the officers fired three rounds into the truck. One of the bullets struck the passenger in the truck, puncturing his spine. The Eleventh Circuit held, in those circumstances, that"a reasonable jury could find that [the suspects'] escape did not present an immediate threat of serious harm to [officers] or others on the road." 264 F.3d at 1034.* See also id. *at 1034 n. 8 (distinguishing that case from* Smith, Cole, *and* Scott). *In* Donovan, *the Seventh Circuit held that officers engaged in a high-speed pursuit were not justified in using deadly force—in this case, a road block—to stop a fleeing motorcycle. The court stated that it was "very skeptical" of an approach that would allow police to use deadly force to end vehicular pursuits in all circumstances, because "not every fleeing suspect poses a grave danger." 17 F.3d at 951. In both* Vaughan *and* Donovan, *unlike in this case, the suspects already were driving in a dangerous manner without regard for the safety of others. But in those cases, that danger was held to be insufficient to justify deadly force.*

None of the cases decided by our sister circuits and cited by the dissent even remotely supports a holding in this case that Brosseau was justified in using deadly force. Unlike the dissent, we believe that there is a manifest difference between swerving at cars while driving at ninety miles per hour and then smashing a patrol car with an officer standing next to it, *see Smith,* 954 F.2d at 347–48; driving an eighteen-wheel truck at ninety miles per hour through heavy traffic, *see Cole,* 993 F.2d at 1330–31; leading a twenty-minute chase at 100 miles per hour and attempting to run down an officer, *see Scott,* 205 F.3d at 877–78; and driving at high speeds on the wrong side of the road with headlights off and accelerating toward a patrol car, *see Pace,* 283 F.3d at 1281–82, on one hand; and getting into a vehicle and fleeing, or preparing to flee, on the other.

To the extent that the dissent looks to the particular facts of this case rather than to the general danger of police chases, it does not view the evidence in the light most favorable to Haugen, as we are required to do on summary judgment. For example, to portray Haugen as violent and therefore dangerous, the dissent asserts that he was engaged in a "violent brawl" when Brosseau arrived on the scene. Dissent at 395. By all accounts, however, Haugen was on the receiving end of the violence. Tamburello stated, "[W]hen he seen me he started to run.... And I ran over and grabbed him. Got into a little scuffle there.... I was on top of him on the ground." Atwood, Tamburello's companion, stated that when Tamburello caught Haugen, he "squirmed a little bit. Tried to get away. You know, he begged him, didn't want to go[.]" Nocera, Haugen's girlfriend, stated that Tamburello "ran up and tackled Ken to the ground," and "continued to pounce on him out here by the [car]." Moreover, the "brawl" (if that is what it was) was finished before Brosseau arrived.

Further, to exaggerate the danger of Haugen's escape, the dissent stresses that Haugen had to escape through a "narrow passageway" and a dangerous "obstacle course." Dissent at 397–98. Haugen said that he was in a "small, tight space" that was "not like a parking lot," but that the driveway was twenty feet wide, giving him "plenty of room" and a "clear, straight shot" to get to the street. The photographs of the scene show that Haugen had more than enough room to escape without

hitting anything or anyone. Indeed, he was able to drive away safely even after Brosseau shot him.

Finally, the dissent characterizes Haugen as "deranged" and "wild," dissent at 17093, 17098, but this characterization is not supported by the record. Brosseau stated that she held her handgun to Haugen's temple, that he yelled "you're gonna have to fuckin kill me." But her version of the facts is contradicted by Haugen's version of the facts and by the other witnesses, who saw and heard no such thing. The dissent also asserts that Haugen was behaving "suicidally," dissent at 17090, but there is no indication in the record that Haugen intended to harm himself. (Of course, on the dissent's view, fleeing from police in a vehicle was itself suicidal since the police could shoot to kill.)

### e. Fourth Amendment Conclusion

Based on the foregoing, we conclude that there is insufficient objective evidence in the record to grant Brosseau's summary judgment motion. Taken in the light most favorable to Haugen, the objective evidence, examined in light of the totality of circumstances surrounding this case and evaluated as of the time Brosseau actually fired her gun, does not support a conclusion as a matter of law that Brosseau had "probable cause to believe that [Haugen] pose[d] a significant threat of death or serious physical injury to the officer or others." *Garner*, 471 U.S. at 3, 105 S.Ct. 1694. We therefore conclude a reasonable jury could conclude, based on this evidence, that Brosseau's conduct violated Haugen's Fourth Amendment right. *See Katz*, 533 U.S. at 201, 121 S.Ct. 2151.

### 2. Qualified Immunity

Having determined that "a violation could be made out on a favorable view of [Haugen's] submissions," *id.*, we must next decide whether Brosseau is nonetheless entitled to qualified immunity. She is not entitled to immunity if the Fourth Amendment right at issue was clearly established. *See id.* For a right to be clearly established, it must be defined with sufficient specificity that a reasonable officer would have known she was violating it.

In some situations, the Fourth Amendment's general prohibition against excessive force may not be sufficiently specific to put an officer on notice of what conduct is allowed and what is not:

> [T]here is no doubt that *Graham v. Connor* ... clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet that is not enough. Rather, we emphasized in *Anderson* "that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."

*Id.* at 201–02, 121 S.Ct. 2151 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). In other words, if Brosseau made a reasonable mistake about what the law requires, she is immune from suit. *See id.* at 205, 121 S.Ct. 2151.

On the other hand, state officials are not entitled to qualified immunity simply because no case with materially similar facts has held their conduct unconstitutional. *See Hope v. Pelzer*, 536 U.S. 730, 739–41, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1136–37 (9th Cir.2003). The standard is one of fair warning: where the contours of the right have been defined with sufficient specificity that a

state official had fair warning that her conduct deprived a victim of his rights, she is not entitled to qualified immunity. *See Pelzer*, 536 U.S. at 740 & n. 10, 122 S.Ct. 2508.

Beyond the general proposition that excessive force is unconstitutional, the Supreme Court in *Garner* articulated a "special rule" governing the use of deadly force. *See Monroe v. City of Phoenix*, 248 F.3d 851, 860 (9th Cir.2001). Under *Garner*, deadly force is only permissible where "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." 471 U.S. at 11, 105 S.Ct. 1694. *See, e.g., Harris*, 126 F.3d at 1202 (holding that the FBI agent in the Ruby Ridge civil case was not entitled to qualified immunity); *Curnow*, 952 F.2d at 324–25 (holding that officers were not entitled to qualified immunity where they shot a suspect who possessed a gun but was not pointing it at the officers and was not facing the officers when they shot).

The doctrine of qualified immunity operates "to protect officers from the sometimes hazy border between excessive and acceptable force." *Katz*, 533 U.S. at 206, 121 S.Ct. 2151. Officers are not liable when they err in borderline cases. *See Deorle*, 272 F.3d at 1285. But the evidence here, when taken in the light most favorable to Haugen, does not present a borderline case. Viewing the evidence in Haugen's favor, Brosseau shot Haugen in the back even though he had not committed any crime indicating that he posed a significant threat of serious physical harm; even though Brosseau had no objectively reasonable evidence that Haugen had a gun or other weapon; even though Haugen had not started to drive his vehicle; and even though Haugen had a clear path of escape. Viewing the evidence in Haugen's favor, there is insufficient objective

evidence to support Brosseau's stated concern that, at the time she shot him, Haugen posed a significant risk to police officers or others in the area. We therefore conclude that Brosseau's mistake about the requirements of the Fourth Amendment was unreasonable, and that she had " 'fair warning' that [her] conduct deprived [Haugen] of a constitutional right." *Pelzer*, 536 U.S. at 740, 122 S.Ct. 2508.

We are mindful that police officers are called upon "to make split—second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397, 109 S.Ct. 1865. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396, 109 S.Ct. 1865. We must judge Officer Brosseau's action at the time she decided to shoot, and we must give her leeway to make reasonable mistakes.

But we are also mindful of the grave threat to constitutional rights that is present when government officials use deadly force against citizens. "[W]hile giving due deference to difficult judgment calls made on the street, we also must insure the rights of citizens, even fleeing felons, to be free from unreasonable seizures." *Donovan*, 17 F.3d at 951. "The intrusiveness of a seizure by means of deadly force is unmatched." *Garner*, 471 U.S. at 9, 105 S.Ct. 1694. "The use of deadly force is a self-defeating way of apprehending a suspect and so setting the criminal justice mechanism in motion. If successful, it guarantees that that mechanism will not be set in motion." *Id.* at 10, 105 S.Ct. 1694. It was for that reason that the Supreme Court in *Garner* held that deadly force may not be used simply because a felony suspect is successfully evading ar-

rest. Viewing the evidence in Haugen's favor, Brosseau's use of deadly force was a clear violation of *Garner,* and consequently she is not entitled to summary judgment based on qualified immunity.

**B. Fourth Amendment Claims Against the City and Police Department**

In addition to suing Officer Brosseau, Haugen also sued the City of Puyallup and the Puyallup Police Department. Municipalities are "persons" subject to suit under 42 U.S.C. § 1983. *See Monell v. New York City Dept. of Social Serv.,* 436 U.S. 658, 691 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Municipalities cannot be held liable under a traditional *respondeat superior* theory. Rather, they may be held liable only when "action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691, 98 S.Ct. 2018.

Haugen's complaint did not allege, and he has not argued to us on appeal, that Brosseau was acting pursuant to any preexisting policy when she shot him. Rather, he contends that the city and the police department are at fault because they failed to discipline Brosseau after the shooting. Haugen cannot, of course, argue that the municipality's later action (or inaction) caused the earlier shooting. Haugen argues instead that the city and police department should be held liable because they "ratified" Brosseau's decision to use deadly force.

The ratification doctrine, asserted as a basis for municipal liability, originated in *St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). There, a plurality of the Supreme Court stated that "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Id.* at 127, 108 S.Ct. 915. But the

sentence from *Praprotnik* must be read in context. The Court held in *Praprotnik* that to establish municipal liability, a plaintiff must "prove[ ] the existence of an unconstitutional municipal policy." *Id.* at 128, 108 S.Ct. 915. A single decision by a municipal policymaker "may be sufficient to trigger section 1983 liability under *Monell,* even though the decision is not intended to govern future situations," *Gillette v. Delmore,* 979 F.2d 1342, 1347 (9th Cir.1992) (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)), but the plaintiff must show that the triggering decision was the product of a "conscious, affirmative choice" to ratify the conduct in question. *Gillette,* 979 F.2d at 1347. In the present case, Haugen has made no such showing.

Although some municipal pronouncements ratifying a subordinate's action could be tantamount to the announcement or confirmation of a policy for purposes of *Monell,* here there are no facts in the record that suggest that the single failure to discipline Haugen rises to the level of such a ratification. *See, e.g., Santiago v. Fenton,* 891 F.2d 373, 382 (1st Cir.1989) (refusing to hold that the "failure of a police department to discipline in a specific instance is an adequate basis for municipal liability under *Monell*"). The City of Puyallup and the Puyallup Police Department are therefore entitled to summary judgment.

**C. State Law Claims Against Brosseau**

Haugen also sued Brosseau based on state law tort claims. Under Washington law,

[i]t is a complete defense to any action for damages for personal injury or wrongful death that the person injured or killed was engaged in the commission of a felony at the time of the occurrence

causing the injury or death and the felony was a proximate cause of the injury or death.

Wash. Rev. Code § 4.24.420 (2003). The district court dismissed Haugen's state law claims because, in its view, Haugen was engaged in the commission of a felony when Brosseau shot him. Washington law provides that

[a]ny driver of a motor vehicle who wilfully fails or refuses to immediately bring his vehicle to a stop and who drives his vehicle in a manner indicating a wanton or wilful disregard for the lives or property of others while attempting to elude a pursuing police vehicle, after being given a visual or audible signal to bring the vehicle to a stop, shall be guilty of a class C felony. The signal given by the police officer may be by hand, voice, emergency light, or siren. The officer giving such a signal shall be in uniform and his vehicle shall be appropriately marked showing it to be an official police vehicle.

Id. § 46.61.024.

After being shot, Haugen drove away and, for a time, refused to stop for police. He ultimately pled guilty to a felony under § 46.61.024. But, as discussed in section A.1.c., *supra*, there is a disputed factual question about when Brosseau shot Haugen. Construing the facts in Haugen's favor, it appears that Brosseau may have shot Haugen before he had begun to "drive his vehicle in a manner indicating a wanton or wilful disregard for the lives or property of others." *Id.* It therefore is not clear that he "was engaged in the commission of a felony *at the time of the occurrence* causing the injury" or that his felony "was a proximate cause of" his injury. *Id.* § 4.24.420 (emphasis added). At this stage in the proceedings, it is not clear that Brosseau will have the benefit of the complete defense provided in § 4.24.420. We

therefore reverse the district court's grant of summary judgment on Haugen's state law tort claims.

## Conclusion

For the foregoing reasons, we REVERSE the district court's grant of summary judgment on Haugen's § 1983 claim against Brosseau. We AFFIRM the district court's grant of summary judgment on Haugen's § 1983 claims against the City of Puyallup and the Puyallup Police Department. We REVERSE the district court's grant of summary judgment on Haugen's state law claims against Brosseau. We REMAND for further proceedings.

AFFIRMED in part, REVERSED in part, and REMANDED. Costs to Haugen on his appeal relevant to Brosseau. Costs to the City of Puyallup and the Puyallup Police Department.

REINHARDT, Circuit Judge, concurring:

I join fully in Judge Fletcher's opinion for the court, on the understanding that officers may not use deadly force against an otherwise nondangerous felony suspect simply because a chase of that suspect, high-speed or otherwise, would become or does become dangerous. Rather, as I understand the controlling law, if a high-speed chase of a nondangerous felony suspect would be, or becomes, dangerous, the officers must terminate the chase. In other words, the chase itself cannot create the danger that justifies shooting a suspect who, under *Garner*, may not otherwise be shot. I do not understand the out-of-circuit cases discussed in Judge Fletcher's excellent opinion and in the dissent to hold otherwise.

GOULD, Circuit Judge, dissenting:

I cannot accept the majority's conclusion that Haugen, a visibly disturbed felon willing to do almost anything to avoid capture, did not pose "a significant threat of death or serious physical injury" to others when he attempted a high-speed vehicular flight from police through a suburban residential neighborhood on a Sunday afternoon. Nor can I accept the majority's implicit suggestion that—because police can reduce the danger of a high-speed chase by letting a felon escape—police may never use deadly force to protect the public from the danger posed by a felon's reckless flight from police in a vehicle. The majority's sweeping position, which promises an easy escape to any felon willing to threaten innocent lives by driving recklessly, is indefensible as a matter of law and policy, and it conflicts with our sister circuits' holdings that police officers do not violate the Fourth Amendment by using deadly force to stop a fleeing felon who appears likely to drive an automobile with willful disregard for the lives of others.[1] The majority opinion creates a new obstacle to effective law enforcement in the western United States. It threatens the innocent to protect the guilty.

## I

Under *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the reasonableness of Officer Brosseau's conduct under the Fourth Amendment depends on (1) whether she had probable cause to believe that Haugen's fleeing the scene in his car would pose "a significant threat of death or serious physical injury" to others and (2) whether deadly force was necessary to prevent Haugen's escape. *Id.* at 3, 105 S.Ct. 1694. Officer Brosseau's conduct was reasonable under the *Garner* standard.

Viewing the evidence in the light most favorable to Haugen, as we must at this stage,[2] Officer Brosseau had probable cause to believe that Haugen's fleeing the scene in his car would pose a significant threat of serious harm to others. Haugen was a desperate man capable of desperate measures. Haugen was a felony suspect who, when Officer Brosseau arrived on the scene, was engaged in a violent brawl with two other men.[3] Haugen defied Bros-

---

1. As I explain below, the majority creates a circuit split, departing from the holdings of the Sixth, Eighth, and Eleventh Circuits.

2. This is because the district court granted summary judgment to Officer Brosseau.

3. In an attempt to portray Haugen as appearing peaceful, the majority states that, "[b]y *all accounts*, ... Haugen was on the receiving end of the violence .... [and] the 'brawl' ... was finished when Brosseau arrived." *See supra* at 10611 (emphasis added). The majority omits *Haugen's account* in his deposition, in which he admitted to engaging in acts of violence. Haugen stated that he and his adversary "got into a wrestling thing." Haugen then stated that, just after Officer Brosseau arrived on the scene, he "elbowed Atwood and went for the keys in his truck." Haugen continued, "[T]he police pulled up. [Atwood and Tamburello] were distracted. I elbowed

[Atwood] the rest of the way out of the car and got away from him."

In any event, it does not matter whether Haugen or his adversaries were the initial aggressors in their combat. What matters is Officer Brosseau's "contemporaneous knowledge of the facts," *see Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir.2001), and Officer Brosseau knew only that Haugen was engaged in a violent brawl when she arrived on the scene. It is undisputed that Officer Brosseau received a radio dispatch stating that there was a "fight in progress" and that "[t]wo men were fighting on the ground." Officer Brosseau was entitled to consider the fact that Haugen had been fighting as one factor in assessing Haugen's potential dangerousness, and the majority errs by dismissing it.

seau's orders to stop; he ignored her brandishing a gun at close range; he ignored her beating his car window with the butt of her gun; he ignored her shattering his car window; he ignored her striking him in the head with the butt of her gun; he ignored her attempts to grab his keys. Haugen was behaving wildly, even suicidally (defying an officer brandishing a gun at close range), and Officer Brosseau had probable cause to believe that Haugen would do almost anything to avoid capture. *See Menuel v. City of Atlanta*, 25 F.3d 990, 995 (11th Cir.1994) (from the vantage of an officer confronting a dangerous suspect, "a potential arrestee who is neither physically subdued nor compliantly yielding remains capable of generating surprise, aggression, and death").[4] As Haugen admitted in his deposition, he attempted a highspeed vehicular flight through suburban streets. Haugen admitted that he drove as fast as he could when he left the driveway, that he drove through the residential streets as fast as his car would go in third gear, and that he would have driven faster if the bullet wound had not made it difficult for him to shift gears. Haugen later pled guilty to the felony of "eluding," admitting he drove his vehicle "in a manner indicating a wanton or willful disregard for the lives or property of others." Wash. Rev.Code § 46.61.024. That Haugen, by his own admission, drove his car in a manner indicating "a wanton or willful disregard for the lives . . . of others" is powerful evidence of the reasonableness of Officer Brosseau's earlier belief that he would pose a significant threat of serious harm to others if permitted to escape.

A criminal suspect's fleeing from police in an automobile is inherently dangerous. The National Highway Traffic Safety Administration reports that 314 people were killed during police pursuits in 1998, the last year for which I can find a record.[5] National Highway Traffic Safety Administration, Fatality Analysis Reporting System—ARF, *Fatalities in Crashes Involving Law Enforcement in Pursuit 1998* (2000). Of that total, two were police officers, 198 were fleeing criminal suspects, and 114 were innocent bystanders. *Id.* Presumably, many more high-speed pursuits result in serious injuries.[6]

---

**4.** The majority states that Officer Brosseau was not motivated by a desire to protect the community from Haugen's likely erratic driving. This is false. In Officer Brosseau's tape-recorded police department interview, Brosseau stated that she shot Haugen "to protect my fellow officers *and the community* from an eminent [sic] danger." (emphasis added). She then stated that she was concerned for "pedestrians and officers *and residents in the area*." (emphasis added). In her written statement, Officer Brosseau stated,

> During my encounter with Haugen it was obvious that he was in a wholly unstable frame of mind. He did not exhibit any regard for his own life. I considered Haugen an immediate danger *to all around him* and made every attempt to stop him.

(emphasis added). Officer Brosseau's expressed concerns were to protect the community, the residents in the area, and all those around Haugen. She did not, as the majority implies, limit her concern to people in the immediate area.

**5.** Though these statistics demonstrate that felons fleeing from police in automobiles put the public at serious risk of death or injury, the statistics almost certainly understate the extent of the danger, due to the lack of a mandatory reporting system. John Hill, *High Speed Police Pursuits: Dangers, Dynamics, and Risk Reduction*, Law Enforcement Bulletin 14 (July 2002) ("Even conservative estimates by various researchers recalculate the actual number of fatalities between 400 to 500 deaths per year.").

**6.** The majority faults me for citing these official government statistics, arguing that the Supreme Court in *Garner* rejected "this kind of general statistical approach." *Supra* at 389. The majority misrepresents my analysis. I do not, as the majority says, rely solely on

The annals of law are filled with stories of police chases with tragic ends. In *City of El Centro v. United States*, a driver fleeing from police flipped his van, leading to an explosion that killed him and two passengers and that injured another fourteen passengers. 922 F.2d 816, 818 (Fed. Cir.1990). In *Mays v. City of E. St. Louis, Ill.*, a driver fleeing from police ran into a cement barrier, killing one passenger and severely injuring eight others. 123 F.3d 999, 1000 (7th Cir.1997). In *Roach v. City of Fredericktown*, a driver fleeing from police lost control of his car and collided with an oncoming car, killing himself and seriously injuring others. 882 F.2d 294, 295 (8th Cir.1989). In *Helseth v. Burch*, a driver fleeing from police ran a red light and collided with a pickup truck, killing the truck's passenger, rendering the truck's driver a quadripelegic, and seriously injuring three children in his own car. 258 F.3d 867, 869 (8th Cir.2001) (en banc). In *Mason v. Bitton*, a driver fleeing from police lost control of his car, crossed a median, and collided with an oncoming car, killing the occupants of both cars. 85 Wash.2d 321, 534 P.2d 1360, 1361–62 (1975). These judicial decisions tell the tragic stories of only a few deadly police chases. There have been thousands more in the past. And there will be thousands more in the future, particularly if the majority's view prevails, deterring law enforcement from protecting the public.

I do not suggest that police marksmen may fire at will upon any felon fleeing in an automobile, merely because the felon is leaving the scene of a crime or because the felon has violated traffic laws.[7] Rather, I suggest that where police have probable cause to believe a fleeing felon will drive with willful disregard for the lives of others, the Supreme Court's *Garner* decision permits officers to use deadly force when necessary to protect the public. Officer Brosseau plainly had such probable cause here.

Officer Brosseau was concerned not only with the real possibility that Haugen might cause serious injury or even a fatality if she permitted him to speed through the neighborhood in his car. Brosseau also was concerned with the imminent possibili-

---

statistics to support my view that Officer Brosseau was entitled to use deadly force. Rather, I rely on the objective circumstances—most notably Haugen's wild behavior immediately before he sped away in his jeep—that demonstrated to observers that Haugen was about to drive with willful disregard for the lives of others. My analysis does not depend on the government statistics, which I cite merely to emphasize the reasonableness of Officer Brosseau's decision to use deadly force and the important consequences to our society if Officer Brosseau's appropriate conduct is condemned.

Moreover, my use of statistics is consistent with the Supreme Court's use of statistics in *Garner*. *See* 471 U.S. at 21, 105 S.Ct. 1694 (relying on a Bureau of Justice Statistics report to support the conclusion that "burglaries only rarely involve physical violence.").

7. The majority thus mischaracterizes my analysis as "an approach that would allow officers to shoot a suspect simply because he is fleeing, or is about to flee, in a vehicle." *Supra* at 389. Contrary to the majority's mischaracterization, I would hold that deadly force is reasonable only when it appears that a fleeing felon will drive with willful disregard for the lives of others. Here, Haugen's wild and defiant actions (which included disobeying a police officer brandishing a gun at close range) prior to fleeing in his vehicle plainly indicated that he would take any steps necessary to avoid capture, including driving with willful disregard for the lives of others, which Haugen—by his own admission—subsequently did. As Officer Brosseau stated,

> During my encounter with Haugen it was obvious that he was in a wholly unstable frame of mind. He did not exhibit any regard for his own life. I considered Haugen an immediate danger to all around him and made every attempt to stop him.

ty that Haugen might injure someone on the scene. Photographs in the record show that Haugen "peeled out" (he accelerated, leaving visible skid marks) of a driveway blocked on three sides by houses and a garage. Directly in Haugen's path were parked vehicles containing four persons, including a young child. Only by driving through this narrow passageway,[8] around the corner of a neighbor's house, and across a neighbor's lawn (a maneuver Haugen admitted he executed while accelerating "as quickly as [he] could") did Haugen avoid the cars. Brosseau was right to worry that Haugen, if permitted to speed through this obstacle course, would seriously injure the innocent bystanders or one of the police officers Brosseau believed were running toward the scene on foot to assist her.

The first prong of the Supreme Court's *Garner* test is met. Not only was Haugen fleeing in a 3,000 pound vehicle, but also he was behaving in a manner that suggested he would drive with reckless disregard for the lives of others (as he subsequently did). Presented with a desperate man taking desperate measures in a deadly machine, Officer Brosseau reasonably concluded that Haugen posed a significant threat of serious harm to the community. *See United States v. Aceves–Rosales*, 832 F.2d 1155, 1157 (9th Cir.1987) ("It is indisputed that an automobile can inflict deadly force on a person and that it can be used as a deadly weapon.") (per curiam).

The second prong of the *Garner* test also is met, because deadly force was necessary to prevent Haugen from escaping. Deadly force is not necessary where there exists a less drastic alternative that is "reasonably likely to lead to apprehension before the suspect can cause further harm." *Forrett v. Richardson*, 112 F.3d 416, 420 (9th Cir.1997). Here, Officer

Brosseau attempted several less drastic alternative means of subduing Haugen before shooting him. She called several other officers and a police dog to scour the neighborhood for him. She ordered him to freeze as he ran to his car. She chased him. She ordered him to open the door and to get out of his car. She brandished her gun—effectively warning him that he must relent or be shot. She smashed his driver's side window. She beat his head with the butt of her gun. She tried to take his keys. Only after Officer Brosseau had attempted several less drastic alternatives—alternatives that failed to subdue Haugen—did she resort to the extreme step of shooting Haugen.

Haugen urges that a less drastic alternative would have been for Officer Brosseau to permit him to flee in his car. Haugen urges that officers would have been able to capture him another time. However, Haugen fails to recognize the costs to society of allowing felons to flee without constraint. And Haugen fails to explain by what method those officers would have subdued him *"before [he could] cause further harm,"* as our *Forrett* decision (and common sense) requires. 112 F.3d at 420 (emphasis added). Haugen's reckless departure threatened the safety of people on the scene. His racing through the streets threatened the safety of people in the neighborhood. Research indicates that vehicular flights from police become dangerous very quickly. Fifty percent of all collisions occur in the first two minutes of police pursuit, and more than 70 percent of all collisions occur before the sixth minute of the pursuit. G.P. Alpert, U.S. Department of Justice, National Institute of Justice, *Pursuit Management Task Force Report* (1998). Of-

---

8. Haugen in his deposition described this pas-   sageway as a "small, tight space."

ficer Brosseau correctly decided that waiting was not an option under the circumstances.[9]

Even if permitting Haugen to race away in his automobile *were* a reasonable alternative, we cannot properly fault Officer Brosseau for not thinking of it in the heat of the moment. Judges must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). We must judge Officer Brosseau's conduct from the perspective of a reasonable officer on the scene, not from the perspective of a judge in his or her chambers. *Id.* The majority effectively ignores this command from the Supreme Court, measuring Officer Brosseau's conduct not against the standard of a reasonable officer on the scene, but against the standard of its own inexpert judgment as to what Officer Brosseau should have done under the circumstances.

In sum, I would hold that Officer Brosseau had probable cause to believe that Haugen's leading police on a reckless high-speed car chase through a residential neighborhood would pose a significant threat of serious harm to the community and that the use of deadly force was necessary to prevent his escape. I would hold that Officer Brosseau's shooting of Haugen did not violate Haugen's Fourth Amendment rights.

The majority's contrary holding is objectionable not only because it flouts the Supreme Court's *Garner* standard, but also because it creates a circuit split. The Sixth, Eighth, and Eleventh Circuits all have held, as I would hold, that officers are justified in using deadly force when a fleeing felon appears likely to drive with willful disregard for the lives of others. *See Scott v. Clay County*, 205 F.3d 867, 877 (6th Cir.2000) (holding that police reasonably shot a felon fleeing in an automobile when his reckless driving posed an immediate threat to the safety of officers and innocent civilians); *Smith v. Freland*, 954 F.2d 343, 347–48 (6th Cir.1992) (holding that police reasonably shot a misdemeanant fleeing in an automobile when he posed a threat to officers at a police roadblock and appeared likely to "do almost anything to avoid capture"); *Cole v. Bone*, 993 F.2d 1328, 1330–33 (8th Cir.1993) (holding that police reasonably shot a criminal fleeing in a truck when he posed a threat to travelers driving on a crowded

9. The author of the majority opinion at oral argument asked defense counsel whether Officer Brosseau should have shot Haugen's tires to disable his vehicle. Though the majority opinion does not now rely on this as a possible alternative to the use of deadly force, it is perhaps helpful to explain why shooting Haugen's tires likely would not have been an appropriate or effective tactic to end the threat Haugen posed. Shooting Haugen's tires may not have disabled his car. Haugen still could have escaped—and endangered others—by driving with a flattened tire or two. More importantly, Officer Brosseau would have endangered herself and others had she shot at Haugen's tires. Police ammunition is designed to disable human beings, not to disable automobiles. Had Officer Brosseau fired at Haugen's tires at close range, her bullets might have ricocheted, killing or injuring her or an innocent bystander. Even if Officer Brosseau's bullets penetrated a tire, the bullets would not necessarily have come harmlessly to rest. The bullets could have continued their trajectory, ricocheting off the ground or automobile, killing or injuring the innocent. *See* Rick Parent, *When Police Shoot*, Police Magazine, Oct. 2000 ("Unlike the scenes depicted by 'Hollywood,' the 'shooting out of a tire' can be a precarious and dangerous event."). Officer Brosseau was wise not to shoot Haugen's tires. This "alternative" was no alternative at all.

interstate highway); *Pace v. Capobianco,* 283 F.3d 1275, 1281 (11th Cir.2002) (holding that police reasonably shot a felon fleeing in an automobile when he appeared likely to continue using his vehicle aggressively during a police pursuit).

Contrary to the holdings of every circuit to consider analogous issues, the majority holds that an officer violates a fleeing felon's Fourth Amendment rights by using deadly force to prevent a dangerous vehicular flight; it appears that the majority believes that officers can reduce the danger of a highspeed chase by forgoing it.[10] The majority believes that police officers should permit felons to speed away unpursued rather than attempt to stop them. *Supra* at 387 ("[Officers] could either have discontinued a chase if it became too dangerous, or could have forgone a chase entirely."); *id.* at 389 ("[A]n officer must sometimes forego or discontinue deadly force and allow a suspect to escape."). The majority slights the important law enforcement interests in pursuing fleeing felons. *See, e.g., Donovan v. City of Milwaukee,* 17 F.3d 944, 951 (7th Cir.1994) ("Police officers may, *and ought to,* pursue fleeing suspects, and where those suspects present 'a threat of serious physical harm, either to the officer[s] or others, it is not constitutionally unreasonable to prevent escape by using deadly force.' ") (emphasis added). The majority neglects the fact that if police are forbidden to pursue, then many more suspects will flee—and successful flights not only will reduce the number of crimes solved but also will cre-

ate serious risks for passengers and bystanders. *See Mays v. City of E. St. Louis,* 123 F.3d 999, 1003 (7th Cir.1997). Moreover, the majority errs by putting the onus on *police* to end the pursuit by letting the felon escape, rather than on the fleeing *felon,* who at all times has the power to avoid injury to himself and others by halting as the law requires. *See id.* at 1004 (holding that a police officer's pursuit of a fleeing felon in an automobile played a "causal role" in an ensuing wreck, "but not the *kind* of cause the law recognizes as culpable.... [A] criminal's effort to shift the blame [to police] ... is not one that any legal system can accept."). There are several problems with the majority's reasoning.

First, the majority implies, contrary to the record evidence, that Haugen would have driven safely and carefully away from the scene if he had not been followed by police squad cars. But it is unrealistic to conclude that Haugen, a deranged and defiant felon, would suddenly have been transformed into a model citizen and careful driver the moment he drove away from the scene and did not hear police sirens in pursuit. And even if Officer Brosseau had believed that her fellow officers would not pursue Haugen's vehicle, Brosseau still would have had probable cause to believe that Haugen would speed away from the scene with willful and wanton disregard for others' safety. Indeed, even *before* the police squad cars gave chase, Haugen was, by his own admission, "standing on the

---

**10.** More candid than the majority opinion, Judge Reinhardt's separate concurring opinion restates the majority's holding in explicit terms. The concurring opinion states, "I join fully in Judge Fletcher's opinion for the court, on the understanding that officers may not use deadly force against an otherwise nondangerous felony suspect simply because a chase of that suspect, high-speed or otherwise, would become or does become danger-

ous. Rather, as I understand the controlling law, if a high-speed chase of a nondangerous felony suspect would be, or becomes, dangerous, the officers must terminate the chase. In other words, the chase itself cannot create the danger that justifies shooting a suspect...." *Supra* at 394. The majority opinion never disavows Judge Reinhardt's separately stated view, which, in any event, animates the majority opinion's analysis.

gas" in the driveway, accelerating "as quickly as [he] could," within a "small, tight space," a fact that confirms the reasonableness of Officer Brosseau's earlier concern about others' safety.

Second, the majority implies (with no basis in the record) that Washington law or Puyallup Police Department policy prohibited (or, at least, discouraged) Officer Brosseau's fellow officers from pursuing Haugen in their squad cars. Although police officers in Washington may have to compensate a person who is injured by police officers' negligent conduct while pursuing a fleeing felon, *Mason v. Bitton*, 85 Wash.2d 321, 534 P.2d 1360, 1363 (1975), Washington law does not prohibit police from pursuing a fleeing felon in a vehicle. So the majority errs by effectively holding that Officer Brosseau was required to assume that her fellow officers would not chase Haugen in their squad cars and that Haugen would drive away carefully, safely, and unpursued.

Third, Officer Brosseau's fellow officers *in fact* chased Haugen in their squad cars, so Officer Brosseau was correct in assuming that a police pursuit would occur. Officer Brosseau was entitled to consider the potential danger of that police pursuit in assessing the danger Haugen posed to others.

The majority apparently prefers, as a matter of policy, that police departments discourage their officers from pursuing felons in automobiles. If the majority had its way in setting law enforcement policy, no police officer ever would pursue a felon at high speed; the police would surrender, rather than the felon, who would be given a free pass to an easy escape. In my view, the majority errs by allowing its policy

preference to corrupt its analysis of the danger Haugen posed to the community by fleeing in a vehicle in a deranged mental state.

Having created a circuit split by misapplying *Garner*, the majority downplays its departure from our sister circuits' decisions by urging that those decisions approved of deadly force in circumstances very different from those presented here. Although every case presents unique facts, the facts in our sister circuits' decisions are similar to the facts here in important respects. In the Sixth, Eighth, and Eleventh Circuit cases, as in this case, a suspect was fleeing from police in an automobile, a machine that can be extremely dangerous when not operated with great care and due regard for the public safety. *See Scott*, 205 F.3d at 871–72; *Smith*, 954 F.2d at 344; *Cole*, 993 F.2d at 1330; *Pace*, 283 F.3d at 1277. In those cases, as in this case, the felon refused orders to halt. *See Scott*, 205 F.3d at 871; *Smith*, 954 F.2d at 344; *Cole*, 993 F.2d at 1330; *Pace*, 283 F.3d at 1277. In those cases, as in this case, the felon was behaving in a desperate and unstable manner. *See Scott*, 205 F.3d at 872; *Smith*, 954 F.2d at 344; *Cole*, 993 F.2d at 1330–31; *Pace*, 283 F.3d at 1277–78. In those cases, as in this case, the felon appeared likely to take extreme steps to avoid capture. *See Scott*, 205 F.3d at 872; *Smith*, 954 F.2d at 344; *Cole*, 993 F.2d at 1331; *Pace*, 283 F.3d at 1277–78. Most importantly, in those cases, as in this case, the felon appeared likely to drive with willful disregard for the lives of others. *See Scott*, 205 F.3d at 872; *Smith*, 954 F.2d at 344; *Cole*, 993 F.2d at 1330–31; *Pace*, 283 F.3d at 1277–78.[11]

11. It is worth noting that the suspects in *Scott, Smith, Cole,* and *Pace* were suspected of crimes less serious and less dangerous than the burglary and battery of which Haugen was suspected. *See Scott*, 205 F.3d at 871 (suspect ignored a traffic sign); *Smith*, 954 F.2d at 344 (suspect ran a stop sign); *Cole*, 993 F.2d at 1330 (suspect drove through toll

The majority attempts to distinguish our sister circuits' holdings on the ground that police in those cases used deadly force to *end* a dangerous high-speed flight, rather than to prevent a dangerous high-speed flight from commencing. But our sister circuits did not, as the majority implies, require that police officers wait until *after* a suspect has endangered the lives of others before using deadly force. Nor could they have so held. The Supreme Court's *Garner* decision requires courts to determine whether officers have probable cause to believe a suspect will pose a threat of serious physical harm *in the future,* not whether the suspect posed such a danger *in the past. See Garner,* 471 U.S. at 11–12, 105 S.Ct. 1694.

At the time Officer Brosseau shot Haugen, Haugen's vehicle had not yet begun to move. But an objective observer would have reasonably concluded that Haugen was embarking on a desperate, potentially deadly, high-speed vehicular flight through residential neighborhoods. That Haugen was only beginning to execute his plan of driving with willful and wanton disregard for the lives of the innocent does not mean, as the majority suggests, that Haugen did not pose a "significant threat of death or serious physical injury" to others. Nothing requires a police officer, like some modern-day Epimetheus, to disregard prospective danger and attend only to dangers that have passed. It was good that Brosseau acted when she did.

Contrary to the majority's suggestion, neither the Seventh Circuit's *Donovan* decision nor the Eleventh Circuit's *Vaughan v. Cox* decision lends support to the majority's novel holding. Both *Donovan* and *Vaughan* are consistent with my view—compelled by the Supreme Court's *Garner*

decision—that police can use deadly force when necessary to stop a fleeing felon who appears likely to drive with willful disregard for the lives of others. In *Donovan,* the Seventh Circuit held that genuine issues of material fact existed as to whether deadly force was proper when "there [was] no evidence that [the suspect] imperiled anyone (except himself and his willing passenger) ... [by] driving his motorcycle through empty city streets in the wee hours of the morning." 17 F.3d at 951. Here, by contrast, Haugen's own testimony—describing his attempted high-speed flight through a suburban residential neighborhood in his jeep on a Sunday afternoon—shows that Haugen's conduct would have imperiled many people, both on the scene and in the community, if Officer Brosseau had not reasonably intervened.

In *Vaughan,* the Eleventh Circuit held that genuine issues of material fact existed as to whether deadly force was proper when police shot without warning a fleeing suspect. 264 F.3d 1027, 1031, 1031 n. 2 (11th Cir.2001) (vacated by 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002), reinstated and supplemented on remand at 316 F.3d 1210 (11th Cir.2003)). Here, by contrast, it is undisputed that Officer Brosseau effectively warned Haugen that he would be shot if he did not submit to arrest.

Fourth Amendment analysis requires a delicate balancing of individual and societal interests, *Michigan v. Summers,* 452 U.S. 692, 700 n. 12, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), and an individual's interest in his or her life is of unmatched importance. But when a felon threatens innocent lives in a base attempt to escape responsibility

booth without paying); *Pace,* 283 F.3d at 1276 (suspect driving at night without head-

lights).

for his or her crimes, police officers do not act unreasonably in using deadly force to protect the community. I would hold that Officer Brosseau did not violate Haugen's Fourth Amendment rights and that the district court properly granted summary judgment in her favor.

\* \* \*

With perhaps the purpose, but certainly not the effect, of obscuring its departure from the Supreme Court's *Garner* standard and our sister circuits' precedents, the majority deploys an array of rhetorical devices that, individually and collectively, serve only to accentuate the weaknesses of the majority's rationale.

First, the majority implies that its holding is consistent with those of our sister circuits. But no other court has ever come close to holding, as the majority holds today, that police may never use deadly force to protect the public from the danger posed by a felon's reckless flight from police in a vehicle. *See Scott*, 205 F.3d at 877 (holding that police reasonably used deadly force to stop a suspect fleeing in a vehicle); *Smith*, 954 F.2d at 347–48 (same); *Cole*, 993 F.2d at 1330–33 (same); *Pace*, 283 F.3d at 1281 (same). Second, the majority implies that police officers' decision to pursue Haugen in their police cruisers was of dubious legality under Washington law. But it was not; such chases are permissible, though they must be conducted with due care. *See Mason*, 534 P.2d at 1363. Third, the majority states that we cannot properly take judicial notice of the official government statistics I cited to emphasize the dangerousness of high-speed flights by felons from police. But this is incorrect. *See, e.g., Chastleton Corp. v. Sinclair*, 264 U.S. 543, 548, 44 S.Ct. 405, 68 L.Ed. 841 (1924) (Holmes, J.) ("[T]he Court may ascertain as it sees fit any fact that is merely a

ground for laying down a rule of law...."). Fourth, the majority states that the Supreme Court in *Garner* rejected "[the dissent's] kind of general statistical approach." *See supra* at 389. But I do not use any "general statistical approach," and, in any event, the Supreme Court used statistics in *Garner* in precisely the way I use them here. *See* 471 U.S. at 21, 105 S.Ct. 1694. Fifth, the majority states that I do not view the facts in the light most favorable to Haugen. But I have relied only on facts Haugen does not dispute, facts that compel the conclusion that Haugen's fleeing in his vehicle would have posed a significant threat of death or serious physical injury to others.

The majority's artful phrasing and overwrought lucubrations should not and cannot obscure the majority's departure from the Supreme Court's and our sister circuits' law. Acting somewhat as a police commissary for the western states and territories in our jurisdiction, rather than as a constitutional court, the majority imposes serious and unworkable restrictions on police officers' efforts to bring criminals to justice and to protect the community. I cannot join the majority in that effort.

**II**

The majority's holding that Officer Brosseau violated Haugen's rights is wrong. But it is not *as wrong* as the majority's holding that those rights were "clearly established" at the time of the shooting. It should be undeniable that Officer Brosseau did not violate Haugen's "clearly established" rights and so was qualifiedly immune from suit.

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). If "it would be clear to a reasonable officer that his conduct was

unlawful in the situation he confronted," then qualified immunity does not apply. *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). But if, on the other hand, "officers of reasonable competence could disagree on th[e] issue, immunity should be recognized." *Malley*, 475 U.S. at 341, 106 S.Ct. 1092.

Officer Brosseau was not plainly incompetent.[12] Nor did she knowingly violate the law. Police officers of reasonable competence could disagree whether deadly force was justified.[13] In fact, federal appeals courts of reasonable competence *do* disagree on the issue.[14] And judges, unlike police officers, have the luxury of studying the constitutional issues in the calm of their chambers, with the benefit of lawyers' briefing, and after hearing oral arguments. *See Ganwich v. Knapp*, 319 F.3d 1115, 1125 (9th Cir.2003) ("[J]udges should not expect police officers to read *United States Reports* in their spare time, to study arcane constitutional law treatises, or to analyze Fourth Amendment developments with a law professor's precision.").

The majority holds Officer Brosseau to an unreasonable standard. Officer Brosseau should be commended, not condemned, for acting with courage and decisiveness to protect the public from a dangerous felon in a deranged mental state embarking on a potentially deadly flight from police. I respectfully dissent.[15]

---

**12.** Rather, I would say Officer Brosseau is very competent.

**13.** Indeed, the Puyallup Police Department Firearms Review Board concluded, after an investigation, that Officer Brosseau's actions did not violate Washington law or police department policy.

**14.** The majority does not disagree only with my dissenting views. The majority also disagrees with the considered wisdom of the Sixth, Eighth, and Eleventh Circuits, which have held there was no Fourth Amendment violation in circumstances similar to those presented here. *See Scott*, 205 F.3d at 877; *Cole*, 993 F.2d at 1330–33; *Pace*, 283 F.3d at 1281.

**15.** Despite my dissent, I do not disagree with Parts II.B. and II.C. of the majority opinion, affirming the district court's summary judgment in favor of the City of Puyallup and the Puyallup Police Department, and reversing the district court's dismissal of Haugen's state law claims. I disagree with Part II.A., the majority's Fourth Amendment analysis.